**NATIONAL LABOR RELATIONS BOARD**

v.

**BIRDSALL–STOCKDALE MOTOR CO.**

No. 4653.

United States Court of Appeals
Tenth Circuit.

Nov. 5, 1953.

Margaret L. Fassig, Kansas City, Mo., Atty., N.L.R.B., (George J. Bott, Gen. Counsel, N.L.R.B., David P. Findling,

Associate Gen. Counsel, N.L.R.B., A. Norman Somers, Asst. Gen. Counsel, N.L.R.B., and Frederick U. Reel, Washington, D. C., and Alan R. Waterstone, Attys., N.L.R.B., Detroit, Mich., on the brief), for petitioner.

Frederick A. Potruch (Potruch, Fredricks & Lerten and Erwin Lerten, Los Angeles, Cal., on the brief), for respondent.

Before PHILLIPS, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

This is a petition to enforce an amended order[1] of the National Labor Relations Board.[2]

On April 19, 1950, the Board certified the International Association of Machinists, Lodge No. 750,[3] as the collective bargaining agent of the employees of the Birdsall-Stockdale Motor Company[4] in a designated unit. Birdsall refused to bargain with the Union on the ground it was not engaged in interstate commerce. After appropriate proceedings the Board ordered Birdsall, "its officers, agents, successors and assigns" to cease and desist from the unfair labor practices in which the Board found it had engaged; to post appropriate notices; and to bargain with the Union upon request.

Thereafter, the Board and Birdsall entered into a stipulation by which Birdsall agreed it would be bound by the decision in National Labor Relations Board v. Conover Motor Company, then pending in this court. On November 5, 1951, this court handed down its decision in the Conover case (10 Cir., 192 F.2d 779), directing the enforcement of the Board's order in that case. On December 27, 1951, Birdsall posted the required notices and on February 12, 1952, met with the Union, as the representative of such employees, in a bargaining conference. At that meeting Birdsall advised the Union that its business might be sold. The second bargaining conference was set for February 26, 1952, but that meeting was fruitless, because in the meantime Birdsall had sold its business to Johnson Pontiac, Inc.[5] and Birdsall advised its employees that further negotiations would have to be had with Johnson. On February 29, 1952, Birdsall entered into a sales contract with Johnson, under which the latter acquired certain physical properties and assets of Birdsall, such as new and used cars, accessories, machinery and shop equipment, accounts receivable, work in progress and leases on certain property theretofore occupied by Birdsall. There was no transfer of intangibles, such as good will or trade name and no assumption of liabilities. Johnson neither had nor acquired any interest in Birdsall and Birdsall neither had nor acquired any interest in Johnson. The relationship was purely that of a bona fide seller and buyer. Birdsall was dissolved on June 30, 1952. Johnson went into occupation of certain quarters theretofore occupied by Birdsall. Birdsall's used car lot, body shop and warehouse were excluded from the sale. Johnson discontinued a storage business previously carried on by Birdsall and opened a garage for servicing cars belonging to army personnel stationed at Camp Carson near Colorado Springs, Colorado—a new operation. Johnson also obtained a franchise for General Motor trucks and the distributorship for Dayton tires—lines which had not been handled by Birdsall. The resulting expansion necessitated the employment of additional salesmen by Johnson and the shifting of personnel.

Birdsall's franchise from Pontiac Motor Division of General Motors Corporation was not transferrable, but on Feb-

1. The Board's original decision and order are reported in 94 N.L.R.B. 580 and its supplemental decision and amended order in 101 N.L.R.B. 83.

2. Hereinafter called the Board.

3. Hereinafter called the Union.

4. Hereinafter called Birdsall.

5. Hereinafter called Johnson.

ruary 28, 1952, Johnson acquired a franchise directly from Pontiac.

Johnson took applications from each of Birdsall's former employees and advised them that they would be retained if they were able to perform their work satisfactorily. Birdsall's employees were transferred to Johnson's payroll.

On February 26, 1952, the Union wrote Johnson, requesting it to continue the negotiations with the Union as the certified representative of the employees. Johnson took the position that it was not bound by the Board's order against Birdsall.

On July 14, 1952, the Board granted a motion to reopen the record and remand the proceeding to the Regional Director for further hearing. The hearing was set for July 29, 1952, before a trial examiner. Written notice of the hearing was mailed to Birdsall, Johnson and the Union on July 18, 1952. No unfair labor charge had been filed against Johnson and no complaint had been issued by the Board against Johnson, charging it with unfair labor practices, and no finding was made by the trial examiner or the Board that Johnson was engaged in interstate commerce within the meaning of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. Instead, the Board elected to proceed against Johnson upon the doctrine of the responsibility of a successor to remedy the unfair labor practices of its predecessor, announced in the Alexander Milburn case, 78 N.L.R.B. 747.

At the hearing Birdsall moved to quash the notice of hearing and to dismiss the proceeding as to it, on the ground that it was a defunct and non-existent corporation. The motion was denied.

On September 11, 1952, the trial examiner handed down a supplemental intermediate report and findings of fact.

He found that Birdsall was a defunct corporation, no longer having capacity to comply with the Board's decision and order directing it to bargain with the Union; that the policies of the Act could be effectuated only if the Board's decision and order imposed such a duty on Johnson as successor to Birdsall, and that Johnson, as Birdsall's successor, by operation of law, was bound to cooperate in dissipating the unfair labor practices of Birdsall, its predecessor, by recognizing and bargaining with the Union. The Board approved the supplemental intermediate report of the trial examiner and issued an amended order directing Birdsall and its successor, Johnson, jointly and severally to cease and desist from the unfair labor practices found and upon request to bargain collectively with the Union as the exclusive bargaining representative of the employees in the unit and to post the usual notices of compliance.

◼ The enforceability of a Board order against a successor or assign depends, not upon the mere use of the words "successors and assigns" in the order, but upon the relationship between the respondent named in the order and its successor or assign.[6] The term "successors and assigns" in a Board order does not enlarge its scope beyond that defined by Rule 65(d) of the Federal Rules of Civil Procedure,[7] 28 U.S.C.A.. which rule reads:

"Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys,

6. Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 15, 65 S.Ct. 478, 89 L.Ed. 661; Southport Petroleum Co. v. National Labor Relations Board, 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718; Walling v. James V. Reuter, Inc.,

321 U.S. 671, 674, 64 S.Ct. 826, 88 L.Ed. 1001.

7. Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 14, 65 S.Ct. 478, 89 L.Ed. 661.

and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."

While administrative agencies have considerable latitude to shape their remedies within the scope of their statutory authority, the courts may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law.[8]

Where successors and assigns are in active concert or participation with a defendant or respondent in the violation of an order, or are instrumentalities through which the defendant or respondent seeks to evade an order, they are brought within the scope of contempt proceedings by Rule 65(d), supra.[9]

Orders of the National Labor Relations Board are binding upon successors and assigns whose operations are "merely a disguised continuance of the old employer."[10]

The Board places much reliance on Southport Petroleum Co. v. National Labor Relations Board, 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718 and Walling v. James V. Reuter, Inc., 321 U.S. 671, 64 S.Ct. 826, 88 L.Ed. 1001, but the Supreme Court, in the Regal Knitwear case, made it clear that those decisions were predicated, not merely on succession, but on a consideration of the relationship between the defendant and the successor which might of itself establish liability within the terms of Rule 65 (d),[11] a relationship not present in the instant case.

It is important, of course, that the policy of the National Labor Relations Act be effectuated. But Johnson, the successor here, was not an instrumentality through which Birdsall sought to evade the Board's order; Johnson had not been in active concert or participation with Birdsall in the violation of such order; and Johnson's operations were not merely a disguised continuance of the former operations by Birdsall. On the contrary, Johnson was a bona fide successor, in no wise associated with and acting wholly independently of its predecessor, Birdsall. Under such circumstances, equally important considerations of public policy require that Johnson should not be charged with the wrongs of its predecessor and should not be adjudged of wrongdoing on its part without complaint, notice, full opportunity to present its defense and the other essential requirements of due process of law.

In the light of the principles announced and the views expressed in Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661, we feel compelled to hold that the amended order is not enforceable against Johnson.

National Labor Relations Board v. Armato, 7 Cir., 199 F.2d 800 is not in conflict with the conclusion we have reached. There the Board had certified a Union as a bargaining agent of a group of employees. The business passed to a successor who became the employer of such group. A complaint charging unfair labor practice by such successor was issued. It defended on the ground the change in employer terminated certification. The court held

8. Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 13, 65 S.Ct. 478, 89 L.Ed. 661; Chase National Bank v. City of Norwalk, 291 U.S. 431, 436–437, 54 S.Ct. 475, 78 L.Ed. 894; Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 234, 38 S.Ct. 65, 62 L.Ed. 260.

9. Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 14, 65 S.Ct. 478, 89 L.Ed. 661.

10. Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661; Southport Petroleum Co. v. National Labor Relations Board, 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718.

11. See also: National Labor Relations Board v. Blackstone Mfg. Co., 2 Cir., 123 F.2d 633, 635.

the certification remained in effect. The order in that case was predicated on a finding of unfair labor practices by the successor, itself, and did not undertake to impose responsibility on the successor for the acts of its predecessor or to require the successor to dissipate the unfair labor practice of its predecessor. See 97 N.L.R.B. 971.

Enforcement is denied.