## NATIONAL LABOR RELATIONS BOARD v. GATKE CORPORATION.

### No. 9245.

Circuit Court of Appeals, Seventh Circuit. June 13, 1947.

Rehearing Denied July 7, 1947.

Gerhard P. Van Arkel, Gen. Counsel, and Dominick L. Manoli, Atty., both of Washington, D. C., Morris P. Glushien, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Reeves R. Hilton, Atty., National Labor Relations Board, all of Washington, D. C., for petitioner.

John Harrington, of Chicago, Ill., for respondent.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

National Labor Relations Board, petitioner herein, seeks enforcement of its order directing respondent, Gatke Corporation, to cease and desist from refusing to bargain with the Union and coercing the employees in the exercise of their right to self-organization.

The Union, the United Construction Workers[1] had been "certified" July 21, 1944, by the Board, as the bargaining agent for the Company's employees. Conferences were held between the Union's agents and the Company and its attorney, with the re-

[1] Affiliated with the United Mine Workers.

sult that several issues [2] were settled, and several were not settled.[3] The Company refused on December 6, 1944 to sign a "partial" contract covering the agreed subjects.

The dispute was then carried to the War Labor Board early in 1945; the Regional Panel thereof issued its directive October 11, 1945, and on appeal taken by the Company the National War Labor Board issued its directive, December 11, 1945.

The Company chose not to honor the Directive, since "it had no 'legal' effect."

The Union filed with the Company, on October 25, 1945, a list of its members pursuant to the Directive Order, which list of employees disclosed to the Company that the Union no longer represented a majority of the employees.

The Company thereupon, on January 22, 1946, wrote the Union the following letter, which is one of the bases of the charge of refusal to bargain:

"January 22, 1946.

"Dear Mr. Barnhart:—

"I have discussed the subject matter of your letter of January 7, 1946 with Mr. Gatke.

"The Company believes that the Directive Order of the National War Labor Board is wrong. I have advised Mr. Gatke that War Labor Board Directive Orders are only recommendations, and that the Courts have so held. I have also advised him that the reasons advanced by the War Labor Board for recommending maintenance of membership,—namely to compensate unions for their no strike pledge, are now non-existent.

"The Company also considers that the provision of the Directive Order relating to the payment of retroactive wages is unreasonable.

"The Company is consequently unwilling to follow the recommendations of the National War Labor Board.

"I have been advised by the office of the Regional Director of the National Labor Relations Board at Indianapolis that you have amended the charge heretofore filed by you against the Company to include an allegation that the Company has refused to bargain collectively with the United Construction Workers.

"The Company is convinced that the United Construction Workers do not represent a majority of its employees. The list of employees which you submitted to the Company for the check-off of dues, following the War Labor Board's Directive Order contained the names of only a small minority of the Company's employees. A number of the employees whose names were on that list have since notified the Company that they were not members of the Union and did not desire to be represented by it.

"I have advised Mr. Gatke that the National Labor Relations Board should be informed of these facts. Consequently, we plan to submit this information to the Regional Board.

"Yours very truly,

"John Harrington."

A reading of the evidence before the Labor Board trial examiner convinces us that an anti-union attitude, on the part of respondent, and particularly against the United Construction Workers, existed. This hostility was manifested by speeches of Mr. Gatke, by conversations and by the utterances of respondent's foremen and its plant manager.[4]

---

[2] Seniority, hours and overtime pay, recognition, grievance procedure, military service, strikes and lockouts.

[3] Wages, vacations, maintenance of membership and check-off.

[4] Mr. Barnhart, Union Officer:

(quoting Mr. Gatke.) "I am going to tell you what I told Mr. Sweeney of the A. F. of L., I told him that he did not represent the right kind of people down there, the better class of people did not belong to the union, and I convinced him

that I was right about it, and he walked out and left us."

John Skees, former employee, president of union.

"Q. And do you recall a conversation which you had with Mr. Mikesell at his office concerning the union? A. I do. * * * It was over some remark that I had made * * * and Mr. Mikesell had sent word to my foreman * * * that he wanted to see me. * * * Mr. Mikesell told me he had heard that I was

The Gatke Corporation, an Illinois company, manufactures at its Indiana plant, inter alia, asbestos friction products, brake linings, etc. It does about a hundred thousand dollar business a year.

The Examiner made findings which the Board approved and adopted, which, among other things found

" * * * that the respondent had engaged in and was engaging in certain unfair labor practices and recommending that it cease and desist therefrom and take certain affirmative action, as set forth in the copy of the intermediate Report attached hereto. * * *

"The Trial Examiner found that the respondent violated Section 8(1) of the Act by various acts and statements of its officers and supervisory employees, as set forth in the Intermediate Report. We find that these acts and statements, when considered in their entirety, disclose a coercive course of conduct by the respondent which interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed to them in Section 7 of the Act. * * *

"The Trial Examiner further found that the respondent violated Section 8(5) of the Act by its refusal to sign a contract with the Union on December 6, 1944, and at all times thereafter, including its refusal, on January 22, 1946, to recognize the Union as collective bargaining representative of its employees in an appropriate unit. * * *

In January 1946, the respondent notified the Union for the first time that the respondent believed that the Union no longer represented a majority of its employees, and since that time the respondent has refused to deal with the Union as the bar-

---

making remarks, but he didn't state what the remarks was, and also that these remarks was holding me back in the shop.

"Q. What remark had you made * * *? A. Well I don't remember what the remark was that I had made, but it was probably something pertaining to the shop in there, that we would straighten up something after the union had came in."

"Q. Throughout your period of employment was a notice posted on the bulletin board about whether or not you could belong to a union? A. That is right * * * Well, as near as I can recollect, 'Mr. Gatke again informs you that you do not have to belong to the union to work here,' or words to those effect."

Dora Brown, employee:

"Q. Who is your foreman? A. Earl West.

"Q. Do you recall * * * Mrs. Rybold having a conversation with you at the plant? A. Yes.

"Q. Does she work for Mr. West? A. Yes.

"Q. * * * what did she say? A. Well, she said did I want to sign that paper. I said, 'What paper?' She said a paper to throw the union out so there will be no strike, and I said, 'I am not signing no papers.' "

"Q. Do you recall anything he (Mr. Gatke) said? A. He said, 'If you want a union, why not get one something like the A. F. L.' "

Merritt Coffing, employee:

"A. Oh, it just runs in my mind he (Mr. Gatke) made some kind of statement that if we was going to have a good union we should have the A. F. of L., that the United Construction Workers wasn't any good.

"Q. Do you recall a conversation that you had with Bill Braddock? A. * * * he is foreman * * * He asked me if I understood the paper that was passed around the other day, and I told him that I did. He said he thought the war was over, and so was the War Labor Board, and he thought we could do away with the union now."

Leo Renier (discharged employee, not ordered reinstated by Board.)

"A. Well, Mr. Gatke * * * said, 'If you fellows want a union, I don't see why you picked on this union. Why didn't you get something like the A. F. of L.? * * * He said, 'Ladies, I would have you to understand that if we had a union in here, one of the first things they would ask for would be seniority.' * * * 'You know what would happen,' * * * 'These men have all been here longer than you ladies * * * and naturally that would leave you ones out. * * *

"Q. Now, how close was this speech to the election? A. It was just previous to the election * * * I would say it was the day before. * * * Mr. Gatke looked over the contract, throwed the contract down on the table, * * * he said, 'You might as well know it now as later, I will never sign your contract.' He said, 'I don't intend to have any union in my shop.' "

gaining representative of its employees. We agree with the Trial Examiner's finding that the respondent thereby refused to bargain with the Union within the meaning of Section 8(5) of the Act. * * *

"As found by the Trial Examiner, we believe that the situation here is one in which the principles laid down in the Allis Chalmers case should be applied. Although a considerable period has elapsed since its certification, the Union, while exercising due diligence, has been unable to secure for the employees in the unit that it represents the full benefits of collective bargaining, because of a resort to the orderly procedures of the War Labor Board.

"Nor are we satisfied that the list of union members in good standing submitted to the respondent by the Union in October 1945, pursuant to the Regional War Labor Board's Order, served to rebut the presumption of the continued existence of the Union's majority status, as the respondent contends. There is a real difference between the designation of a labor organization as collective bargaining representative and membership therein. They are not synonymous. The Act guarantees to employees the right to bargain collectively through representatives of their own choosing, and Board-conducted elections afford them a means of expressing their choice. In no case is membership a requirement."

"Under these circumstances we believe, and find that on and after January 22, 1946, the certification of the Union continued to bind the respondent to recognize and deal with the Union as the collective bargaining representative of the respondent's employees in the appropriate unit."

It is the Board's contention that the Company should have recognized the Union as the bargaining agent despite the fact that more than a year had elapsed since its certification (a year being the customary period of effectiveness of a certification) and despite the fact the Union evidently no longer represented a majority of the employees. It predicated its conclusion on the Company's disinclination throughout the period to bargain effectively; on the basis that the company was anti-union; and that

a great part of the interval since certification, passed in the proceedings before the War Labor Board. Since public policy requires that the War Labor Board proceedings be honored, their duration and consequent delay, should not be used to defeat an accrued bargaining right.

■ We are convinced that the Board's order is not an arbitrary one, in view of the peculiar facts of the instant case, which reveal a decided management hostility to the certified union which sought persistently—yet politely and amicably—to effect a bargaining agreement with the Company. The only conclusion deducible from the testimony, including the documentary exhibits, is that the Company was stalling off recognition of the Union, and a written contract, in the hope that such tactics would cause the certified Union to lose face and faith with its constituents.

■ We state, however, that this conclusion is not meant to lend sanction to certified bargaining representative's authority for indefinite periods after their certification and especially where it satisfactorily appears they no longer represent the majority of the persons in the bargaining unit. Nothing said in this opinion should be construed as giving sanction of the Board's action, where more than a year has passed since the Board issued its certification or where it appears that the union which received the certification no longer represents the majority of the employees. The facts in each case must determine the date when the effect of the certification expires. The same is true as to the effect of a reduction in the number of employees to a point where the union no longer represents a majority.

■ The unavoidable conclusion which we draw from the record before us necessitates the granting of an order of enforcement. The Board had jurisdiction of the controversy. Its findings have support in the evidence. Upon the facts disclosed the certification was not terminated by the reduction in membership in the union to a point below a majority.

The petition for an order of enforcement is granted.