In the Matter of David LIVINGSTON, as President of District 65, Retail, Wholesale and Department Store Union, AFL-CIO, Plaintiff-Appellant,

v.

JOHN WILEY & SONS, INC., Defendant-Appellee.

No. 101, Docket 27629.

United States Court of Appeals Second Circuit.

Argued Nov. 5, 1962.

Decided Jan. 11, 1963.

Irving Rozen, New York City (Myron Nadler and Weisman, Allan, Spett & Sheinberg, New York City, on the brief), for plaintiff-appellant.

Charles H. Lieb, New York City (Robert H. Bloom and Paskus, Gordon & Hyman, New York City, on the brief), for defendant-appellee.

Before MEDINA, SMITH and KAUFMAN, Circuit Judges.

MEDINA, Circuit Judge.

District 65, Retail, Wholesale and Department Store Union, AFL-CIO appeals from an order of the District Court for the Southern District of New York denying its motion to compel arbitration under a collective bargaining agreement. The opinion below is reported at 203 F. Supp. 171.

Beginning in 1949 the Union entered into collective bargaining agreements with Interscience Publishers, Inc., the

last one dated February 1, 1960, for a term of two years ending January 31, 1962. None of these agreements was stated in terms to be binding on Interscience "and its successors." On October 2, 1961 Interscience effected a consolidation for bona fide business reasons with another publishing firm, John Wiley & Sons, Inc. A dispute arose with respect to the effect of the consolidation on the status of the collective bargaining contract and the Union. Interscience before the consolidation, and Wiley thereafter took the position that the agreement was automatically terminated for all purposes by the consolidation, and that all rights of the Union and the employees arising out of the agreement were at an end. The Union adhered throughout the discussions and correspondence both before and after the consolidation to the view that the agreement was not terminated by the consolidation and that certain rights had become "vested" which Wiley must recognize. The details of this controversy will be more fully described shortly. The upshot was that the Union demanded arbitration of the dispute, under Article XVI of the Agreement (set forth in full in the Appendix to this opinion), relating to "Grievances: Adjustment of Disputes: Arbitration," and on January 23, 1962, the Union commenced this action against Wiley to compel arbitration. The District Court assumed that the agreement survived the consolidation, but denied arbitration on two grounds: that the agreement should be so construed as "to exclude from arbitration matters involving the entire collective bargaining unit, as distinguished from the individuals comprising it"; and that, even if not so limited, the Union has failed to avail itself of the grievance procedure described in the agreement and had thus abandoned any rights it might have had to arbitration of the dispute.

■ We think it clear that the District Court had jurisdiction of the case under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and that the appeal by the Union is properly before us. Textile Workers Union v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972; General Electric Co. v. Local 205, United Electrical Workers, 1957, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028; Goodall-Sanford, Inc. v. United Textile Workers, AFL Local 1802, 1957, 353 U.S. 550, 77 S.Ct. 920, 1 L.Ed.2d 1031. We also hold, as matter of federal law, (1) that the agreement and rights arising therefrom were not necessarily terminated by the consolidation, and that Wiley and the Union are proper parties to the arbitration proceeding; (2) that the terms of the agreement contemplated the arbitration of just such a dispute or controversy as the one before us and that the attempt to arbitrate here is not an improper effort to secure status as collective bargaining agent for the negotiation of a new contract, nor is it an attempt to secure allegedly proscribed "quasi-legislative" arbitration; (3) that issues raised by Wiley arising out of the Union's alleged failure to comply with certain requirements of the agreement relative to so-called grievance procedure are matters to be decided by the arbitrator.

The facts, sketched above, may be stated more fully as follows:

On October 2, 1961 Interscience employed 80 persons, of whom 40 were covered by the 1960 contract; Wiley employed 300 persons. Interscience, with a single plant in New York City, did an annual business of $1,000,000; Wiley, an older company, had three substantially larger plants, and did an annual business of $9,000,000.

The Union learned of the proposed consolidation in June of 1961 and on June 27 wrote Interscience, stating its position that the contract would remain in force notwithstanding the consolidation. On September 19, 1961 Interscience initiated conversations with the Union, in the course of which Interscience insisted that the contract would end upon consolidation. On September 21, 1961 Interscience wrote its employees, stating its views on termination and offering jobs at the Wiley plant in New York City. On October 2, 1961, the effective date of the consoli-

dation, Wiley wrote the Union stating that the contract was terminated.

All of Interscience's 80 employees were subsequently employed by Wiley, but 11 later resigned and received severance pay voluntarily granted by Wiley. The Union does not allege discrimination against these persons, but attributes their resignation to worsened working conditions. Wiley has placed the Interscience employees under its own pension plan, crediting them for past service with Interscience, but it does not recognize their seniority or other rights under the Interscience contract, nor does it recognize the appellant Union or any other union.

The Interscience contract obliged Interscience to make quarterly payments into an employee pension fund. The Union contends that Interscience's payment for the third quarter of 1961 was inadequate, and that Wiley is obliged and has failed to make up this deficit and also to make the payment due for the fourth quarter. The total claim amounts to $8,000. The contract also contains provisions according to the Interscience employees rights regarding seniority, job security, grievance procedure, and vacation and severance pay.

On January 23, 1962 the Union commenced this action in the District Court to compel Wiley to arbitrate the dispute between the parties concerning the effect of the consolidation upon the contract and the so-called "vested" rights of the Union and the employees to continued payments

by Wiley to the Interscience employee pension fund and to seniority, job security, grievance procedure, and vacation and severance pay, "now and after January 30, 1962."

I

██ The question of "substantive arbitrability" is for the court not for the arbitrator to decide. Atkinson v. Sinclair Refining Co., 1962, 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462. The controlling law is not New York law but federal law. Textile Workers Union v. Lincoln Mills, supra, 353 U.S. at 456, 77 S.Ct. 912, 1 L.Ed.2d 972. The sources of that law, to be fashioned by judicial inventiveness, are the express provisions of the national labor laws, the basic policies underlying these laws, "state law, if compatible with the purpose of Section 301" and which "will best effectuate the federal policy," and accepted principles of traditional contract law. Id. at 457, 77 S.Ct. at 918; Local 174, Teamsters, etc. v. Lucas Flour Co., 1962, 369 U.S. 95, 105, 82 S.Ct. 571, 7 L.Ed. 593. See Jay, Arbitration and the Federal Common Law of Collective Bargaining Agreements, 37 N. Y.U.L.Rev. 448 (May, 1962); Comment, The Emergent Federal Common Law of Labor Contracts: A Survey of The Law under Section 301, 28 Univ.Chi.L.Rev. 707 (1961).

██ The Union tells us that under Section 90 of the New York Stock Corporation Law, McKinney's Consol.Laws, c. 59,[1] the contract did not automatically

1. "*Rights of creditors of consolidated corporations*

"The rights of creditors of any constituent corporation shall not in any manner be impaired, nor shall any liability or obligation due or to become due, or any claim or demand for any cause existing against any such corporation or against any stockholder thereof be released or impaired by any such consolidation; but such consolidated corporation shall be deemed to have assumed and shall be liable for all liabilities and obligations of each of the corporations consolidated in the same manner as if such consolidated corporation had itself incurred such liabilities or obligations. The stockholders of the respective constituent corporations shall continue subject to all the liabilities, claims and demands existing against them as such, at or before the consolidation; and no action or proceeding then pending before any court or tribunal in which any constituent corporation is a party, or in which any such stockholder is a party, shall abate or be discontinued by reason of such consolidation, but may be prosecuted to final judgment, as though no consolidation had been entered into; or such consolidated corporation may be substituted as a party in place of any constituent corporation, by order of the court in which such action or proceeding may be pending."

terminate because the provisions of this statute are to the effect that the consolidated corporation is "deemed to have assumed" and "shall be liable" for "all liabilities and obligations" of the constituent corporation just as if it "had itself incurred such liabilities or obligations." But this legislation is clearly not binding upon us, and we may or may not find that the rule thus formulated, with or without qualifications or in some modified form, "will best effectuate the federal policy." We have found no case formulating a rule of federal law on the point at issue here, and none has been called to our attention. We must accordingly, to the best of our competence, and giving due weight to the legislation of the Congress in the area of labor-management relations and other sources relevant to the task, including the provisions of Section 90 of the New York Stock Corporation Law, fashion for the first time the rule of federal law that is to govern the decision of the first and preliminary question presented for our consideration: Did the consolidation abruptly terminate the collective bargaining agreement and the rights of the Union and the employees created or arising thereunder?

■ We think it clear and we decide and hold that the federal policy of promoting industrial peace and stability, especially with reference to arbitration procedures set up in collective bargaining agreements (Textile Workers Union v. Lincoln Mills, supra, 353 U.S. at 453–454, 77 S.Ct. 914, 1 L.Ed.2d 972; United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409; Local 174, Teamsters, etc. v. Lucas Flour Co., supra, 369 U.S. at 105, 82 S.Ct. 571, 7 L.Ed. 593; Drake Bakeries Inc. v. Local 50, 1962, 370 U.S. 254, 263, 82 S.Ct. 1346, 8 L.Ed.2d 474) can be fostered and sustained only by answering this question in the negative. And we reach this conclusion despite the fact that the agreement contains no statement that its terms are to be binding upon Interscience "and its successors," and the further fact that neither of the parties had a possible consolidation in mind when the terms of the agreement were negotiated and settled. Not only would a contrary rule involve manifest injustice, a circumstance not to be lightly disregarded or brushed aside; it would be a breeder of discontent and unharmonious relations between employer and employees, and a source of unnecessary and disrupting litigation.

A further principle, particularly applicable in the formulation of new segments of federal labor law, is, we think, the principle of restraint that requires us to formulate the rule that is decisive of the case before us, and to go no further.

Thus, while we do hold that the consolidation did not *ipso facto* terminate all rights of the Union and the employees created by or arising out of the collective bargaining agreement,[2] we do not decide what those rights are. As will appear in a later portion of this opinion, the power and function of making a decision, or a series of decisions, with respect to these rights, have been reserved by the parties for the arbitrator in the course of the arbitration proceedings that will follow our reversal of the order appealed from. Cf. Goodall-Sanford, Inc. v. United Textile Workers, AFL Local 1802, 1 Cir., 1956, 233 F.2d 104, 110, affirmed, 1957, 353 U.S. 550, 77 S.Ct. 920, 1 L.Ed.2d 1031. Our decision, then, cannot be construed as holding generally that collective bargaining agreements survive consolidation. We merely hold that, as we interpret the collective bargaining agreement before us in the light of Supreme Court decisions enunciating the federal policy of promoting industrial peace and stability, especially with reference to arbitration proce-

---

2. As this action was commenced prior to January 31, 1962, the termination date of the agreement, our decision is entirely consistent with Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co., 2 Cir., 312 F.2d 181, where we held that grievances arising after the expiration of a collective bargaining agreement are not arbitrable.

dures set up in collective bargaining agreements, we cannot say that it was intended that this consolidation should preclude this Union from proceeding to arbitration to determine the effect of the consolidation on the contract and on the rights of the employees arising under the contract.

■ Several additional objections to arbitration have been made on the ground of improper parties. Wiley contends that it cannot be made a party to the arbitration proceeding because it was not a party to the agreement and the arbitration clause was not binding upon it. We think that our discussion above disposes of this objection as well. When negotiating and before effectuating the consolidation of October 2, 1961, Wiley was aware of the existence of the collective bargaining agreement and of its obligations under the New York Stock Corporation Law, Section 90. In view of the national policy of promoting industrial peace and stability and the special function of arbitration in promoting these ends, above adverted to, we think and hold, in the exercise of our duty to fashion an appropriate rule of federal labor law, that it is not too much to expect and require that this employer proceed to arbitration with the representatives of the Union to determine whether the obligation to arbitrate regarding the substantive terms of the contract survived the consolidation on October 2, 1961, and, if so, just what employee rights, if any, survived the consolidation.[3]

3. The National Labor Relations Board has specifically recognized that the rule (see N. L. R. B. v. Aluminum Tubular Corp., 2 Cir., 1962, 299 F.2d 595, 598) that a successor employer will not be required to continue to bargain with a union when there has been a substantial change in the nature of the employment enterprise, does not control the issue, presented in the instant case, of the binding character and meaning of contractual rights under a preexisting agreement. Cruse Motors, Inc., 1953, 105 N.L.R.B. 242, 248. This is because of the inapplicability of the rationale of the rule, which is that certification "is an official pronouncement by the Board that a majority of the employees in a given work unit desire that a particular organization represent them in their dealings with their employer," and that where there has been a substantial change in the nature of the employment enterprise "there may well be a consequent change in the nature of the work required of the employees resulting in differences in their working condition problems. Thus the employees may feel that they can be better served by another employee organization." N. L. R. B. v. Armato, 7 Cir., 1952, 199 F.2d 800, 803. See also N. L. R. B. v. Lunder Shoe Corp., 1 Cir., 1954, 211 F.2d 284, 286.

Similarly inapplicable are cases holding that an existing agreement will not bar a Representation petition under Section 9 (c) of the Labor Management Relations Act when there has been a substantial change in the nature of the employment enterprise. The rationale of these cases, inapplicable here, is that "sound and stable labor relations will best be served by allowing the employees in the reconstituted units to determine for themselves the labor organization which they now desire to represent them." L. B. Spear & Co., 1953, 106 N.L.R.B. 687, 689. Cases involving enforcement of previously obtained orders of the National Labor Relations Board against a successor employer, which may or may not be favorable to Wiley's position (see Annot., 46 A.L.R.2d 592, 1956), are also without significant effect here because of the specific limitations imposed in those cases by Rule 65(d) of the Federal Rules of Civil Procedure (Regal Knitwear Co. v. N. L. R. B., 1945, 324 U.S. 9, 13–14, 65 S.Ct. 478, 89 L.Ed. 661) and the public policy that one should "not be adjudged [guilty] of wrongdoing * * * without complaint, notice, full opportunity to present [one's] * * * defense and the other essential requirements of due process of law." N. L. R. B. v. Birdsall Stockdale Motor Co., 10 Cir., 1953, 208 F.2d 234, 237, 46 A.L.R.2d 587.

Livingston v. Gindoff Textile Corp., S.D.N.Y., 1961, 191 F.Supp. 135, cited by Wiley, is also without application since the original employer there underwent a complete dissolution, rather than a consolidation, and was found to have no legal or substantial factual relationship with the successor employer. Nor was such a showing made in Office Employees International Union, Local 153, AFL-CIO v. Ward-Garcia Corp., S.D.N.Y., 1961, 190 F.Supp. 448.

■ Wiley also argues that the Union is not the proper party to present the claims of these employees. But the fact that the contract has now terminated does not of itself bar arbitration. United Steelworkers of America v. Enterprise Wheel & Car Corp,, 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. There is no showing that the Union here has been decertified. Glendale Mfg. Co. v. Local 520, etc. Garment Workers, 4 Cir., 1960, 283 F.2d 936, cert. denied, 1961, 366 U.S. 950, 81 S.Ct. 1902, 6 L.Ed.2d 1243; Modine Mfg. Co. v. Grand Lodge, etc. Machinists, 6 Cir., 1954, 216 F.2d 326. There is here no rival union, whose rights would be interfered with by the Union's pressing of these employee claims. Kenin v. Warner Bros. Pictures, Inc., S.D. N.Y., 1960, 188 F.Supp. 690. In short, there is no showing that the freedom of choice of any employee would in any way be infringed by the Union's pressing of the employee claims under a preexisting agreement, and we are aware of no reason why the Union may not enforce arbitration of a dispute or controversy concerning rights alleged to have arisen out of and pursuant to the terms of the collective bargaining agreement which it negotiated, especially where there appears to be no other person or entity in a position legally to enforce arbitration.

## II

■■ The issues tendered by the Union for arbitration are:

(a) Whether the seniority rights built up by the Interscience em-ployees must be accorded to said employees now and after January 30, 1962;

(b) Whether, as part of the wage structure of the employees, the Company [Wiley] is under an obligation to continue to make contributions to District 65 Security Plan and District 65 Security Plan Pension Fund now and after January 30, 1962;

(c) Whether the job security and grievance provisions of the contract between the parties shall continue in full force and effect;

(d) Whether the Company [Wiley] must obligate itself to continue liable now and after January 30, 1962 as to severance pay under the contract;

(e) Whether the Company [Wiley] must obligate itself to continue liable now and after January 30, 1962 for vacation pay under the contract.

In its brief and on oral argument the Union characterized the rights claimed by it on behalf of itself and the employees it represents as "property rights" or "vested rights" built up by the employees "during their long years of employment" in accordance with the terms of the collective bargaining agreement.[4] Hence the essence of the proposed submission is that the arbitrator determine the nature of and proper remedy for implementing those rights, if any, as to seniority, pension plan, job security, grievance procedure, and vacation and severance pay,

---

4. In Goodall-Sanford, Inc. v. United Textile Workers, AFL Local 1802, supra, 233 F.2d at 110, the First Circuit recognized that:

"Even without an express reference to that possibility in the contract, in view of the increasingly complex use of compensation in the form of 'fringe benefits,' some types of which inherently are not payable until a time subsequent to the work which earned the benefits, we believe that there may be terms within a union-employer contract whose effect is not necessarily limited to the continuance of the living relationship that exists while the business is being operated as a going concern."

The possibility of such "vested" rights has been recognized specifically with respect to vacation and severance pay [In re Wil-Low Cafeterias, 2 Cir., 1940, 111 F.2d 429, 432; Botany Mills, Inc. v. Textile Workers Union of America, AFL–CIO, 50 N.J.Super. 18, 141 A.2d 107 (1958); In re Potoker, 286 App.Div. 733, 146 N. Y.S.2d 616 (1st Dep't., 1955), affirmed sub nom. Potoker v. Brooklyn Eagle, Inc., 2 N.Y.2d 553, 161 N.Y.S.2d 609, 141 N.E. 2d 841 (1957)]; seniority rights [Zdanok v. Glidden, 2 Cir., 1961, 288 F.2d 99]; and pension plan rights [New York City Omnibus Corp. v. Quill, 189 Misc. 892, 894–896, 73 N.Y.S.2d 289, 291–293 (Sup. Ct.1947), modified on other grounds, 272

which he finds accrued during the term of the collective bargaining agreement. In other words, implicit in the submission is the possibility that the arbitrator may decide that no rights to seniority, pension plan, job security, grievance procedure, or vacation and severance pay, survived the consolidation or the date of expiration of the collective bargaining agreement. It is not our function to express any opinion on the subject, provided the agreement contemplates that such a question or congeries of questions was to be decided by arbitration. United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, 567–569, 80 S.Ct. 1343, 4 L.Ed.2d 1403.[5]

We may note that it is just because the Union seeks to arbitrate the existence and nature of rights which it claims "vested" during the term of the agreement, although maturing after the termination thereof, that arbitration here does not conflict with the rule above discussed, that a successor employer will not be required to continue to bargain with a union when there has been a substantial change in the nature of the employment enterprise. So too, it is because of this claim of "vested rights" that our

---

App.Div. 1015, 74 N.Y.S.2d 925 (1st Dep't., 1947), affirmed, 297 N.Y. 832, 78 N.E.2d 859 (1948); Roddy v. Valentine, 268 N.Y. 228, 197 N.E. 260 (1934)]. Cases holding that no such rights in fact exist, such as Oddie v. Ross Gear & Tool Co., 6 Cir., 1962, 305 F.2d 143, 150, recognize that the matter is solely one of the "construction of the agreement." See Note, Termination of Collective Bargaining Agreements—Survival of Earned Rights, 54 Nw.U.L.Rev. 646, 651 (1959).

5. We realize that there may be serious difficulties in giving to the Interscience employees special treatment in preference to the Wiley employees of long standing. Perhaps the arbitrator can work out some fair lump sum settlement which would avoid later friction. Be that as it may, the very fact that in the instant case we are presented with such difficult issues in a new and important field as yet largely unexplored, is ample reason why we must, as we do, leave the merits to the arbitrator whose creative role in the interpretation of collective bargaining agreements has been well remarked upon. United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. at 578–581, 80 S.Ct. 1347, 4 L.Ed.2d 1409; Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1490–93 (1959).

Of course, if the arbitrator in deciding the merits should purport to establish and enforce rights accruing subsequent to the termination of the agreement, or if, although purporting to define and implement rights accruing under the contract although maturing thereafter, he should make an award which is completely without root and foundation in the collective bargaining agreement itself, we have no doubt that the courts would have no choice but to refuse enforcement of the award. The Supreme Court has clearly stated, United Steelworkers of America v. Enterprise Wheel & Car Corp., supra, 363 U.S. at 597, 80 S.Ct. at 1361:

"When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of the problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance in many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."

Appealing as it is, we cannot yield to the suggestion that we should now enunciate those standards which should guide the arbitrator in his determination of the existence, nature and remedy for implementing any employee rights accruing under and surviving the expiration of the collective bargaining agreement, so that he will know definitely whether any award he may make will "draw its essence from the collective bargining agreement." To do this would be to intrude in a domain not ours and to invert the whole order of procedure in this delicate field of labor relations.

order of arbitration does not conflict with decisions, whose validity we need not pass upon, barring "quasi-legislative" arbitration. See Boston Printing Pressman's Union v. Potter Press, D.Mass. 1956, 141 F.Supp. 553, affirmed, 1 Cir., 1957, 241 F.2d 787, cert. denied, 355 U.S. 817, 78 S.Ct. 21, 2 L.Ed.2d 34; Couch v. Prescolite Mfg. Corp., W.D.Ark., 1961, 191 F.Supp. 737; In re Valencia Baxt Express, Inc., D.P.R., 1961, 199 F.Supp. 103.

A careful scrutiny of the agreement discloses, we think, a perfectly clear intention that the questions propounded by the Union be arbitrated. A distinction is made, on the very face of the agreement, between ordinary grievances personal to individual employees, on the one hand, and other, perhaps more important disputes, such as the one before us, relative to "matters affecting the entire bargaining unit," both of which, however, are subjected to arbitration. Read as a whole the agreement clearly contemplates the arbitration of any "difference" or "dispute" between the Union and the employer "arising out of or relating to this agreement, or its interpretation or application, or enforcement." Arbitration is not limited to "grievances." This language, quoted from Section 16.0 of Article XVI, relating to "Grievances: Adjustments of Disputes: Arbitration," is plainly intended to be broad and comprehensive. And we must remember the teaching of United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. at 584–585, 80 S.Ct. 1347, 4 L.Ed.2d 1409, that the dispute is to be arbitrated unless it is perfectly clear that it is specifically and plainly excluded. The party claiming exclusion has a heavy burden. See Procter & Gamble Independent Union, etc. v. Procter & Gamble Mfg. Co., 2 Cir., 1962, 298 F.2d 644.

The exclusion clause relied upon here is Section 16.5(3) referring to "matters not covered by this agreement." Wiley would have us hold that, because the agreement does not mention the possibility of consolidation, the "matter" in suit is not covered by the agreement.

This is pure sophistry. This suit involves the Union's claim of rights to pension plan, seniority, vacation and severance pay and other matters that are covered by specific provisions of the agreement, and even if such claim is wrong or even untenable and frivolous, this does not bar arbitration. United Steelworkers of America v. American Mfg. Co., supra, 363 U.S. at 568–569, 80 S.Ct. 1343, 4 L.Ed.2d 1403. Moreover, the various specific references to matters reserved for the sole control of the employer and resting in his discretion, contained elsewhere in the agreement, merely emphasize the fact that no such specific exclusionary clauses make reference to any privilege on the part of the employer to consolidate with another company and cut off rights allegedly "vested" in the employees, such as the right to payments to the welfare fund, to vacations, and to seniority. It is not probable that the Union would have agreed to any such exclusionary clause had the subject come up for discussion.

A further argument in support of the interpretation of the agreement given above is that as arbitration is described as "the sole and exclusive" remedy of the parties and the employees, "in lieu of any and all remedies, forums at law, in equity or otherwise," "for any claimed violations of this contract, and for any and all acts or omissions claimed to have been committed by either party during the term of this agreement" (Section 16.9), it is not reasonable to suppose that it was intended that the Union should have no right whatever to resort to arbitration in the event of a consolidation, but should be entirely at the mercy of the employer.

### III

While the Supreme Court has clearly held that the question of "substantive arbitrability" is for the court (Atkinson v. Sinclair Refining Co., supra, 370 U.S. at 241, 82 S.Ct. 1318, 8 L.Ed.2d 462), it has never expressly decided the question as to "procedural arbitrability," namely, whether or not adherence or lack of adherence to the grievance and arbitration

procedure outlined in a collective bargaining agreement is for decision by the court or by the arbitrator. Nor do we discern such a ruling by implication in the fact, adverted to by Wiley, that one week after deciding the Steelworkers cases the Court denied certiorari in Brass & Copper Workers, etc. v. American Brass Co., 7 Cir., 1959, 272 F.2d 849, cert. denied, 1960, 363 U.S. 845, 80 S.Ct. 1609, 4 L.Ed.2d 1728, a case in which the Seventh Circuit had held that the question is for the court. So far as other authority is concerned, this Circuit has never spoken clearly on the issue, and there appears to be a difference of opinion on this point in the other Circuits, with more recent decisions holding that the question is for the arbitrator.[6] The lower federal courts seem also to be split,[7] and the commentators in general agree that the matter is for the arbitrator.[8]

■ This question of "procedural arbitrability" is squarely before us now. By way of preliminary we must, we think, take note of the fact that "substantive arbitrability" and "procedural arbitrability" are separate and distinct matters. The Supreme Court has explained the rule that "substantive arbitrability" is for the court in the following terms:

> "The Congress * * * has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to arbitrate."

United Steelworkers of America v. Warrior & Gulf Co., supra, 363 U.S. at 582, 80 S.Ct 1347, 4 L.Ed.2d 1409; Atkinson v. Sinclair Refining Co., supra, 370 U.S. at 241, 82 S.Ct. 1318, 8 L.Ed.2d 462. However, as Professor Cox has correctly noted in his article in 72 Harvard Law Review, supra at 1511, "the reason for giving the court power to decide what subject matter is within the arbitration clause does not extend" to the issue of "procedural arbitrability," for the court's duty to determine "whether the reluctant party has breached his promise to arbitrate" is exhausted once it has been determined that "the party

---

6. Boston Mutual Life Insurance Co. v. Insurance Agents International, 1 Cir., 1958, 258 F.2d 516 (court function); Brass & Copper Workers v. American Brass Co., supra (court function); Radio Corp. of America v. Association of Professional Engineering Personnel, 3 Cir., 1961, 291 F.2d 105 (arbitrator function); International Association of Machinists, etc. v. Hayes Corp., 5 Cir., 1961, 296 F.2d 238 (citing cases which hold that it is the arbitrator's function).

7. Arbitrator's function: Philadelphia Dress Joint Board, etc. v. Sidele Fashions, Inc., E.D.Pa., 1960, 187 F.Supp. 97; Local 971, United Automobile Workers, AFL–CIO v. Bendix-Westinghouse Automotive Brake Co., N.D.Ohio, 1960, 188 F. Supp. 842; Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., W.D.Pa., 1959, 188 F.Supp. 225, affirmed, 3 Cir., 1960, 283 F.2d 93; United Cement, etc. Workers International Union, AFL–CIO v. Allentown-Portland Cement Co., E.D.Pa., 1958, 163 F. Supp. 816; Insurance Agents International Union, AFL v. Prudential Ins. Co.,

E.D.Pa., 1954, 122 F.Supp. 869 (purporting to apply state law).

Court function: Truck Drivers v. Grosshans & Petersen, D.Kan., 1962, 51 L.R.R.M. 2116; General Tire & Rubber Co. v. Local 512, United Rubber Workers of America, AFL–CIO, D.R.I., 1961, 191 F.Supp. 911, affirmed, 1 Cir., 1961, 294 F.2d 957; United Brick & Clay Workers, etc. v. Gladding, McBean & Co., S.D.Calif., 1961, 192 F.Supp. 64; Brass & Copper Workers, etc. v. American Brass Co., E.D.Wis., 1959, 172 F. Supp. 465, affirmed, 7 Cir., 272 F.2d 849, cert. denied, 1960, 363 U.S. 845, 80 S.Ct. 1609, 4 L.Ed.2d 1728; International Union of Operating Engineers, etc. v. Monsanto Chemical Co., W.D.Ark., 1958, 164 F.Supp. 406.

8. Cox, 72 Harv.L.Rev., supra at 1509–12; Gregory, The Law of the Collective Agreement, 57 Mich.L.Rev. 635, 646–9 (1959); Procedural Requirements of a Grievance Arbitration Clause: Another Question of Arbitrability, 70 Yale L.J. 611 (1961). Contra: 28 Univ.Chi.L.Rev., supra at 732.

seeking arbitration is making a claim which on its face is governed by the contract" or that "the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made." United Steelworkers of America v. American Mfg. Co., supra, 363 U.S. at 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. at 582, 80. S.Ct. 1347, 4 L.Ed.2d 1409. See Philadelphia Dress Joint Board, etc. v. Sidele Fashions, Inc., E.D.Pa., 1960, 187 F.Supp. 97, 100.

Thus the settled law on the issue of "substantive arbitrability" does not control the decision of the separate problem now under discussion, and we think there is ample reason for holding that issues of compliance with grievance and arbitration procedure in the ordinary collective bargaining agreement are properly within the competence of the arbitrator. We find wholly unpersuasive the argument that questions of procedure in collective bargaining agreements involve "largely a matter of contract construction" as to which "the industrial context is irrelevant" and that consequently "the courts' expertise in construing agreements seems to qualify them as the appropriate forum for determining procedural compliance." 28 Univ.Chi.L.Rev., supra at 732. Rather we believe that a holding that this Court or any court should decide the merits of a dispute concerning procedural questions under an arbitration clause of a collective bargaining agreement would be quite inconsistent with the principles and policies enunciated by the Supreme Court to the effect that once it has been determined that the reluctant party has breached his promise to arbitrate, the matter must go to the arbitrator for determination on the merits. United Steelworkers of America v. American Mfg. Co., supra, 363 U.S. at 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Co., supra, 363 U.S. at 581–582, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., supra, 363 U.S. at 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

What is fundamental to the teaching of these cases, as we read them, is the ruling that the parties have bargained for a decision by an arbitrator because they thus have the benefit of his creativity and expertise that are in no small measure due to his knowledge of and familiarity with the industry and shop practices constituting the environment in which the terms of collective bargaining agreement were negotiated and assented to. Surely, and especially under the conditions of the industrial world of today, this environment, and the concrete day-by-day relationships to which the agreement must be applied, includes the implementation of the arbitration clause and its procedural aspects. See Procedural Requirements of a Grievance Arbitration Clause: Another Question of Arbitrability, 70 Yale L.J. 611, 618 (1961); Cox, Reflections upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1509–12; Gregory, The Law of the Collective Agreement, 57 Mich.L.Rev. 635, 646–9 (1959). Cf. Fleming, Problems of Procedural Regularity in Labor Arbitration, 1961 Wash. U.L.Q. 221. Indeed, it may well be that the arbitrator can make his most important contribution to industrial peace by a fair, impartial and well-informed decision of these very procedural matters. To hold matters of procedure to be beyond the competence of the arbitrator to decide, would, we think, rob the parties of the advantages they have bargained for, that is to say, the determination of the issues between them by an arbitrator and not by a court. A contrary decision would emasculate the arbitration provisions of the contract.

The position just above outlined seems to us to be the only sound position to take, especially when we consider what are the particular procedural questions involved in this case. Accordingly, we shall summarize, as briefly as we can, the miscellaneous contentions of Wiley that are

supposed to fall in the category of procedure and the way these contentions are dealt with by the Union. Thus Wiley claims the Union was required to follow Steps 1, 2 and 3, described in Section 16.0. The Union replies that these applied only to an "affected employee," and not to the controversy in this case which affects the entire bargaining unit. The Union also points to the fact that there was an orderly exchange of views, and says this surely was a substantial compliance with the contract. Cf. International Association of Machinists v. Hayes Corp., 5 Cir., 1961, 296 F.2d 238. With respect to Wiley's claim that there was a failure to comply with the requirement of Section 16.6 that "any grievance must be filed with the Employer and with the Union Shop Steward within four (4) weeks after its occurrence or latest existence," the Union replies that the question here is not a "grievance" but a "dispute" or "difference" arising out of the agreement and that this Section has no application to a dispute over such a broad question as to whether all the employees had "vested" rights under the contract inextinguishable by unilateral action by the employer; and that to say this is a "grievance" to be filed "with the Employer and with the Union Shop Steward" borders on absurdity. Moreover, the Union contends that, if some sort of notice of the dispute was required within four weeks after its "occurrence or latest existence," the letter of June 27, 1961, filed within four weeks after the Union learned of the proposed consolidation, was such notice. It is further argued by the Union that the dispute was plainly a continuing one. But the Union adds that even if all its contentions as above stated were to be rejected, there was a clear waiver of procedural requirements by Wiley.

Is it to be supposed that the benefits of arbitration, duly bargained for, are to be indefinitely postponed, just because one of the parties tenders a miscellany of such contentions as these, and argues that no arbitration can be had until after a court has rejected them and they have also been passed upon by this Court?

It is of the essence of arbitration that it be speedy and that the source of friction between the parties be promptly eliminated. Robert Lawrence Co. v. Devonshire Fabrics, Inc., 2 Cir., 1959, 271 F.2d 402, 410, cert. granted, 1960, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, dismissed per stipulation, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37. The numerous cases involving a great variety of procedural niceties already cited in the footnotes to this opinion make it abundantly clear that, were we to decide that procedural questions under an arbitration clause of a collective bargaining agreement are for the court, we would open the door wide to all sorts of technical obstructionism. This would be completely at odds with the "basic policy of national labor legislation to promote the arbitral process as a substitute for economic warfare." Local 174, Teamsters, etc. v. Lucas Flour Co., supra, 369 U.S. at 105, 82 S.Ct. 571, 7 L.Ed. 593. See In the Matter of Jacobson, D.Mass., 1958, 161 F. Supp. 222, 227 (opinion by Wyzanski, J.), reversed and remanded sub nom., Boston Mutual Life Ins. Co. v. Insurance Agents Union, supra. Cf. Procter & Gamble Independent Union, etc. v. Procter & Gamble Mfg. Co., supra, 298 F.2d at 645.

It is for this reason that we cannot agree to the distinction propounded by Judge Palmieri in his very excellent discussion in Carey v. General Electric Co., S.D.N.Y., 1962, 50 L.R.R.M. 2119, 45 CCH Lab. Cas. ¶ 17,599, between matters of procedural compliance requiring the expertise of the arbitrator for decision and those which the courts are capable of deciding on their own. If the court must first decide whether a particular procedural problem calls for the special abilities and knowledge of an arbitrator, there will be inevitable delay. Such a practice, if followed, would develop a whole new body of decisional law, with the usual distinctions and refinements. Moreover, we have serious doubts that the suggested distinction between different types of procedural questions arising out of the arbitration clauses in collective bargaining agreements can be placed

upon any tenable and rational basis. In any event, it is clear that the practical consequences of attempts by the courts to apply such a distinction would be delay and prejudice to the speedy and effective arbitration which we believe the national policy calls for.

Having thus decided that the question of "procedural arbitrability" is for the arbitrator, we do not reach the merits of Wiley's contentions that the Union did not comply with the procedural requirements of the collective bargaining agreement.

Reversed with a direction to order arbitration.

## APPENDIX

Article XVI: Grievances: Adjustments of Disputes: Arbitration.

Sec. 16.0. Any differences, grievance or dispute between the Employer and the Union arising out of or relating to this agreement, or its interpretation or application, or enforcement, shall be subject to the following procedures, which shall be resorted to as the sole means of obtaining adjustment of the difference, grievance, or dispute, hereinafter referred to as "grievance":

Step 1: The grievance, when it first arises, shall be the subject of a conference between the affected employee, a Union Steward and the Employer, officer or exempt supervisory person in charge of his department. The grievance shall be presented orally. If, at this step, the grievance is resolved to the mutual satisfaction of the parties, a memorandum stating the substance of the settlement shall be prepared and signed by the Employer representative and the affected employee. Copies of the same shall be furnished to the Union's Shop Steward and the Employer. In the event that the grievance is not satisfactorily settled within two (2) working days after the conclusion of the conference stated above, the grievance shall be reduced to writing. It shall state the nature of the claim made and the objections raised thereto and shall be signed by the Employer representative and the affected employee.

Step 2: Within five (5) working days thereafter, the grievance shall be the subject of a conference between an officer of the Employer, or the Employer's representative designated for that purpose, the Union Shop Committee and/or a representative of the Union, at which conference the parties will endeavor to resolve and settle the grievance.

Step 3: In the event that the grievance shall not have been resolved or settled in "Step 2", the grievance shall be referred and submitted to arbitration before an impartial arbitrator who shall be chosen by the mutual consent in writing by the Employer and the Union. All grievances not satisfactorily adjusted within two (2) weeks from their inception shall be referred to arbitration, unless such time shall be extended in writing by Employer and the Union.

Sec. 16.1. In the event that the parties fail to agree upon an impartial arbitrator, as provided in "Step 3", the impartial arbitrator, by the filing of a demand for arbitration by the aggrieved party, shall be selected and designated by the American Arbitration Association, pursuant to whose Rules for its Voluntary Labor Arbitration Tribunal, any and all arbitrations shall be conducted.

Sec. 16.2. The arbitrator finally designated to serve in that capacity, after receiving a written statement signed jointly by the Employer and the Union certifying to his selection and designation as aforesaid and containing a concise statement of the issue involved, shall conduct the arbitration in accordance with the Arbitration Law of the State of New York. The decision of the Arbitrator shall be final and binding upon the parties. All expenses incidental to the arbitrator's services, if any, shall be borne equally by the Employer and the Union.

Sec. 16.3. It is agreed that time is of the essence in any arbitration, and

both parties will exert their best efforts to obtain a speedy decision.

Sec. 16.4. It is expressly agreed that there shall be no strike, slow-downs or suspension of work of any nature while a grievance is in the process of negotiation and disposition under the grievance and arbitration procedures of this Article.

Sec. 16.5. It is agreed that, in addition to other provisions elsewhere contained in this agreement which expressly deny arbitration to specific events, situations or contract provisions, the following matters shall not be subject to the arbitration provisions of this agreement:

(1) the amendment or modification of the terms and provisions of this agreement;

(2) salary or minimum wage rates as set forth herein;

(3) matters not covered by this agreement; and

(4) any dispute arising out of any question pertaining to the renewal or extension of this agreement.

Sec. 16.6. The status in effect prior to the assertion of a grievance or the existence of any controversy or dispute shall be maintained pending a settlement or decision thereof. Notice of any grievance must be filed with the Employer and with the Union Shop Steward within four (4) weeks after its occurrence or latest existence. The failure by either party to file the grievance within this time limitation shall be construed and be deemed to be an abandonment of the grievance.

Sec. 16.7. Nothing contained in this Article shall be deemed to be a restriction or limitation of the rights of the Employer, or the Union, or an individual employee, or a group of employees, as specified in Section 9(a) of the Labor Management Relations Act, 1947, as amended. However, whenever any meetings or conferences are held with the Employer during business hours, the Union's employee-representatives shall be limited to only two (2) employees. During negotiations for the renewal of this agreement, the Union's negotiating committee shall be limited to no more than three (3) employees. Except in emergency situations, employees shall not discuss grievances with Stewards during regular working hours.

Sec. 16.8. Grievances or disputes arising out of this agreement shall not be combined or accumulated and submitted as a part of one case or arbitration proceeding. Accordingly, no arbitrator shall have the authority to hear or determine more than one (1) grievance, unless several grievances arise out of the same common state of facts, and are relevant and germane to one another. Whenever any provision in this agreement reserves to the Employer the right to exercise its sole discretion or judgment with respect to specific subjects, events, matters or situations, the exercise or non-exercise of such discretion or judgment shall not be arbitrable.

Sec. 16.9. Except for threatened breaches or actual breaches of the provisions of Article "25" of this agreement ["Strikes and Lockouts"] the arbitration procedure herein set forth is the sole and exclusive remedy of the parties hereto and the employees covered hereby, for any claimed violations of this contract, and for any and all acts or omissions claimed to have been committed by either party during the term of this agreement, and such arbitration procedure shall be (except to enforce, vacate, or modify awards) in lieu of any and all other remedies, forums at law, in equity or otherwise which will or may be available to either of the parties. The waiver of all other remedies and forums herein set forth shall apply to the parties hereto, and to all of the employees covered by this contract. No individual employee may initiate an arbitration proceeding.

KAUFMAN, Circuit Judge (concurring).

In view of the extraordinarily complex problems raised in the case before us, all of which have been thoroughly and per-

suasively dealt with in the opinion of Judge MEDINA and so many of which will have broad ramifications in the growing and yet unshaped field of federal labor law, I deem it my responsibility to clarify what I interpret to be the holding of the court today. We hold that the collective bargaining agreement between Interscience and the Union does not clearly remove from the scope of arbitration the following questions: (1) Whether the collective bargaining agreement as a whole survived the consolidation of Interscience and Wiley; (2) If the agreement did survive the consolidation—thereby imposing upon Wiley an obligation to arbitrate at the behest of the Union disputes arising before its natural termination on January 31, 1962—whether the Union had to comport with the three-step grievance procedure, and if so, whether it did in fact comport with it or was relieved from doing so; and (3) Whether certain Union and employee rights became "vested" under the terms of the agreement.

Although the collective bargaining agreement contains no express provision making its obligations binding upon the successors of the parties, our decision today, in effect, permits the arbitrator to "imply" such a provision into the agreement if, under the circumstances present here, such an implication is proper. In doing so, he will no doubt make an effort to extrapolate the probable intentions and expectations of the parties, to evaluate the change in the nature and scope of the employment unit and employer-employee relationships, the disruptive potential of implying such a clause, and other relevant factors. It is this power to read a successor clause into the collective agreement which makes Wiley a proper party defendant in the case before us. What we decide here is that since the arbitrator *may* find that the agreement was intended to bind successors, and that since Wiley is the successor of Interscience, then Wiley is a potential party to a binding arbitration decree. Our mere refusal to determine that Wiley is not a proper party defendant in this judicial proceeding does not preclude the arbitrator from determining that Wiley was not meant to be bound by the obligations in the collective agreement—either the obligation to arbitrate or the obligation to respect the allegedly "vested" rights of the employees. So too, the Union is a proper party plaintiff, even though the arbitrator may ultimately determine that, because the collective bargaining agreement was not intended to survive consolidation, the Union cannot compel arbitration.

With this interpretation of the court's holding in mind, I enthusiastically register my concurrence.